1

2

3

4              UNITED STATES DISTRICT COURT

5            NORTHERN DISTRICT OF CALIFORNIA

6                   SAN JOSE DIVISION

7

8    DAVID TOVAR, SR., et al.,              Case No.   5:21-cv-02497-EJD

          Plaintiffs,
9                                           **ORDER GRANTING IN PART AND
                                            DENYING IN PART PLAINTIFFS'
10     v.                                   MOTION FOR SUMMARY
                                            JUDGMENT; DENYING
11   CITY OF SAN JOSE, et al.,              DEFENDANTS' MOTION FOR
                                            SUMMARY JUDGMENT; GRANTING
          Defendants.                       MOTION TO STRIKE**
12

13                                          Re: Dkt. Nos. 78, 81, 84

14

15         Plaintiffs David Tovar, Sr. and minors D.T.M. and J.M. ("Plaintiffs") bring claims against

16   the City of San Jose ("City") and several San Jose Police Officers ("Officer Defendants")

17   (collectively, "Defendants") for the loss of their relative, David Tovar Jr. ("Tovar").  *See* Second

18   Am. Compl., ECF No. 45.

19         Before the Court are three motions: (1) Plaintiffs' Motion for Partial Summary Judgment

20   ("MSJ") on their Fourth Amendment claims for excessive force and California state law

21   negligence claims against the City and Officer Defendants James Soh ("Soh"), Alvaro Lopez

22   ("Lopez"), and Topui Fonua ("Fonua"); (2) Defendants' Cross-Motion for Summary Judgment

23   ("Cross-MSJ") on all claims brought against all Defendants, including additional Officer

24   Defendants Hans Jorgensen ("Jorgensen") and Mauricio Jimenez ("Jimenez"); and (3) Plaintiffs'

25   motion to exclude ("*Daubert* Motion") certain opinions proffered by Defendants' expert, James

26   Borden ("Borden").  Pls.' Mot. for Summ. J. ("MSJ"), ECF No. 78; Defs.' Cross Mot. for Summ.

27   J. ("Cross-MSJ"), ECF No. 81; Mot. to Exclude ("*Daubert* Motion"), ECF No. 84.  All motions

28   Case No.: 5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
                                  1

United States District Court
Northern District of California

1  have been fully briefed.  Pls.' Reply in Supp. of MSJ ("MSJ Reply"), ECF No. 82; Defs.' Reply in

2  Supp. of Cross-MSJ ("Cross-MSJ Reply), ECF No. 83; Opp'n to Mot. to Exclude ("*Daubert*

3  Opp'n"), ECF No. 85; Reply in Supp. of Mot. to Strike ("*Daubert* Reply"), ECF No. 86.

4      After carefully reviewing the relevant documents, the Court finds this matter suitable for

5  decision without oral argument pursuant to Local Rule 7-9(b).  For the reasons explained below,

6  the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' MSJ; **DENIES** Defendants'

7  Cross-MSJ; and **GRANTS** Plaintiffs' *Daubert* Motion.

8  **I.    BACKGROUND**

9      On the morning of January 21, 2021, Tovar was shot by Soh, Lopez, and Jorgensen and

10  attacked by Fonua's K-9, with Jimenez's permission, for two minutes and forty seconds.  Tovar

11  was pronounced dead on the scene.  The following events lead to Tovar's death.

12     Soh, Lopez, Fonua, Jorgensen, and Jimenez belonged to the Covert Response Unit

13  ("CRU"), a unit of the San Jose Police Department ("SJPD") specializing in apprehending

14  suspects wanted for violent crimes and known to be armed and dangerous.  Dep. of Officer Alvaro

15  Lopez ("Lopez Dep.") 24, ECF Nos. 78-1, 81-1.  Officer Defendants were assigned to execute a

16  warrant and apprehend Tovar.  *Id.* at 35.

17     Prior to their attempts to apprehend Tovar, Officer Defendants were briefed on the

18  following information.  Tovar was suspected of stealing a car that was found with a shotgun,

19  ammunition, and booking papers with Tovar's name on them.  *Id.* at 34.  Tovar's criminal history

20  included arrests and possible charges and convictions for evading an officer by driving against

21  traffic, felony reckless evading, corporal injury to a spouse or cohabitant, violating a restraining or

22  protective order, weapons possession, first degree residential burglary, grand theft, criminal

23  threats, and illegal possession of a weapon in jail.  Decl. of Hans Jorgensen ("Jorgensen Decl.") ¶

24  5, ECF No. 81-5.  Tovar had a separate warrant issued for $100,000 for two counts of burglary,

25  grand theft, and three counts of a stolen vehicle.  Lopez Dep. 35.  Tovar was wanted as a suspect

26  for interview in shootings from Morgan Hill and Gilroy, including a homicide.  Dep. of Hans

27  Jorgensen ("Jorgensen Dep.") 44, ECF Nos. 78-2, 81-1.  Tovar may have been armed with a

28  Case No.: 5:21-cv-02497-EJD
ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION

1    firearm, may have engaged in a gunfight with officers, and may have had gang associations.

2    Lopez Dep. 29–30.

3         The CRU team attempted to apprehend Tovar prior to January 21, 2021, but Tovar was

4    able to evade apprehension with his car, hitting officers' cars and driving at high speeds on

5    Highway 101 to escape.  Dep. of James Soh ("Soh Dep.") 49–51, ECF No. 78-3, 81-1; Jorgensen

6    Decl. ¶ 19.  There were no guns observed or shots fired during this incident.  *See id.*

7         On the morning of January 21, 2021, CRU officers found Tovar at a hotel in Milpitas

8    driving a stolen car, and then later at a park in San Jose, but Tovar left both locations before the

9    team could set up operations to apprehend him.  Jorgensen Decl. ¶ 21; Jorgensen Dep. 35:13–

10   35:17; Lopez Dep. 55:13–55:25, 66:9–67:19; Soh Dep. 58:21–59:8; Dep. of Officer Fonua

11   ("Fonua Dep.") 23:19–23:24, ECF Nos. 78-4, 81-1.  The officers eventually tracked Tovar to an

12   apartment complex.  Jorgensen Dep. 56.  Tovar was not in his vehicle when the officers arrived, so

13   the officers believed he had gone inside the apartment complex.  Soh Dep. 61.  The plan was for

14   Jorgensen and Fonua to conduct a vehicle takedown once Tovar returned to the car, and Soh and

15   Lopez were assigned to stake out the apartment courtyard to cutoff any potential escape.  *Id.*;

16   Jorgensen Dep. 56–57.

17        Tovar eventually walked back to his vehicle, at which time the officers approached in cars.

18   Jorgensen Dep. 57–58.  Tovar saw the officers and ran back into the apartment complex.  *Id.*  The

19   officers gave Tovar commands to put his hands up and announced "Runner!" on the radio.

20   Morales Decl., Ex. 2, Officer Bronte Body Worn Camera ("Bronte BWC"), at 1:15–1:32; Ex. 3,

21   Officer Flores Body Worn Camera ("Flores BWC"), at 0:22–0:24; Ex. 4, Officer Jorgensen Body

22   Worn Camera ("Jorgensen BWC"), at 0:20–0:21.  Jorgensen was the first to park his car and

23   follow Tovar into the apartment complex's outdoor courtyard.  Jorgensen Dep. 58.  Soh and Lopez

24   also parked and ran to the courtyard after Jorgensen.  Soh Dep. 61–21.  Fonua and Jimenez were

25   on the scene but stayed back to provide cover with the K-9.  Fonua Dep. 25–26.  Jorgensen, Soh,

26   and Lopez were equipped with AR-15 Rifles and Red Dot technology optics.  Soh Dep. 35;

27   Jorgensen Dep. 18, 48; Lopez Dep. 25.

28   Case No.: 5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
     3

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

### A.   Video Evidence

The shooting incident and K-9 deployment was captured on the apartment complex surveillance camera.  *See* Dr. Begault's Rule 26 Report, ECF No. 78-5; Dr. Begault's Synchronized Video ("Synchronized Video"), ECF No. 78-6.  Portions of the incident were also captured on Jorgensen and Lopez's body worn camera ("BWC").  *See id.*  The following series of events are depicted on this video evidence.

While Jorgensen is parking his car and Lopez is running toward the building, Tovar runs upstairs onto the second floor of the outdoor apartment complex, turns left, and runs out of frame.  An officer is heard saying "he's upstairs, he's breaking into the apartment." Other officers repeat, "into the apartment."  Jorgensen then enters the apartment complex and appears in the middle of the frame on the first floor courtyard, aiming his rifle up at the second floor where Tovar ran out of frame.  Jorgensen yells "put your hands up, you're going to get shot."  Tovar then runs across the second floor from the left side of the screen to the right side of the screen while Jorgensen stands on the first floor courtyard with his rifle aimed at Tovar.  Jorgensen says "put your hands up" twice as Tovar runs in his direction.  Tovar does not comply and runs past Jorgensen.  As Tovar runs past Jorgensen, Jorgensen fires his rifle at Tovar six times.

Soh and Lopez enter the first floor courtyard while Jorgensen is shooting.  Tovar appears to fall to the ground after Jorgensen's sixth and final shot.  Less than one second after Jorgensen fired his last shot, Soh and Lopez opened fire on Tovar, collectively firing their weapons nine times while Tovar was lying on the ground.

After Soh and Lopez stop shooting, Fonua runs upstairs with the K-9 and stands on the second floor landing at a distance from Tovar.  Tovar lays face down with his feet toward Fonua. Jorgensen joins Fonua on the second floor and aims his rifle at Tovar.  Other officers also make their way up to the second floor landing and aim their rifles at Tovar.  The officers proceed to repeat commands for Tovar to not move and to show his hands for approximately two minutes. The K-9 barks repeatedly while the officers made their commands.  Tovar appears still and silent throughout these two minutes, apart from raising his head slightly about forty-five seconds after

1    Soh and Lopez fired their last shot.

2          After approximately two minutes and eighteen seconds had passed after Soh and Lopez

3    fired their last shot, Fonua releases his K-9 on Tovar.  The K-9 jumps onto Tovar and begins to

4    bite and drag Tovar's body.  Tovar does not react to the K-9 attack or make any noticeable

5    movement or sound.  The K-9 attack lasts for two minutes and forty seconds before Fonua recalls

6    the K-9.  Throughout the entire K-9 attack, Tovar continues to lie face down on the ground and

7    offers no noticeable verbal response or physical movement.  The officers continue to aim their

8    rifles at Tovar throughout the attack.

9          After Fonua recalled the K-9, the officers approach Tovar and handcuff him before calling

10   for medical assistance.  Tovar was later pronounced dead at the scene.

11         **B.    Jorgensen's Testimony**

12         Jorgensen was the first to enter the apartment complex.  Jorgensen Dep. 59.  Jorgensen

13   entered the apartment complex on the first floor and saw Tovar trying to get into an apartment on

14   the other end of the second floor.  *Id.*  Jorgensen then observed Tovar turn and run in Jorgensen's

15   direction from the floor above him.  *Id.*  As Tovar ran in his direction, Jorgensen saw Tovar

16   looking at him.  *Id.* at 72–73.  After Tovar ran past him, Tovar was no longer looking at

17   Jorgensen.  *Id.* at 73.  Jorgensen stated "put your hands up" twice and saw Tovar reaching with his

18   right hand towards his waistband and pulling out what Jorgensen believed to be the butt of a

19   firearm.  *Id.* at 59–60.[1]  Jorgensen then fired his weapon six times while Tovar ran in the opposite

20   direction because he believed Tovar was "in a position of advantage that he could shoot [him]

21   from," and he "knew that there were other officers entering the courtyard that [Tovar] could

22   engage and shoot."  *Id.* at 50–51, 60.

23         Jorgensen believed that Tovar had been shot after he observed Tovar fall to the ground.  *Id.*

24   at 61.  Once Tovar fell to the ground, Jorgensen stopped shooting.  *Id.* at 51.  Jorgensen testified

25   that it would be a misuse of his firearm to shoot while Tovar was on the ground.  *Id.* at 51–52.

26   _____

27   [1] Officers never recovered a gun from Tovar, only a cell phone, pair of scissors, and screwdriver.
     Jorgensen Dep. 53.

28   Case No.: 5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION

United States District Court
Northern District of California

### C.      Soh's Testimony

When Soh entered the first-floor courtyard, he heard over the radio "Please hands. Don't reach into your waistband," around the same time Flores put out a radio transmission that "he's reaching into his waistband." Soh Dep. 63:6–63:14; Flores BWC, at 0:22–0:24, 0:30–0:32. Soh then saw Tovar running on the second story landing, turning his body away from him, and looking back at Jorgensen. Soh Dep. 53–56. Soh observed Tovar's sweater flaring out, which Soh believed was caused by the recoil of a firearm. *Id.* at 65–66. Then Soh heard shots, which lead Soh to believe that Tovar was shooting Jorgensen. *Id.* at 65. After hearing shots, Soh aimed his rifle at Tovar and fired five times. *Id.* Soh testified that he did not shoot Tovar while he was lying on the ground and would not have shot Tovar if he was lying on the ground. *Id.* at 56.

### D.      Lopez's Testimony

When Lopez entered the courtyard on the first floor, he saw Jorgensen pointing his rifle toward the apartment complex. Lopez Dep. 87. Lopez saw Tovar running with a black object in his right hand but could not tell what it was. *Id.* at 92. Lopez could see Tovar making a motion as if he were aiming something down at Jorgensen. *Id.* at 93. Lopez could hear yelling and gunshots and feared that Tovar and Jorgensen were in a gunfight. *Id.* at 92–93. Then Lopez raised his rifle and aimed it at Tovar's chest area using his red dot technology. *Id.* at 95, 97. Lopez pulled the trigger three times with his red dot on Tovar's chest and testified that Tovar was not laying down for any of the shots. *Id.* at 100. Lopez stopped shooting because he saw "Tovar going down." *Id.* at 103–04. Lopez testified that he would not have shot after Tovar fell to the ground because Tovar would not have been a sufficient threat to justify deadly force. *Id.* at 99–101.

### E.      Fonua's Testimony

Fonua entered the apartment complex and heard verbal commands given followed by gunfire, but he could not see anything. Fonua Dep. 26–27. After the shooting ended, Fonua walked up the stairs with the K-9 to where Tovar was lying on the ground down the hall. *Id.* at 28–29. Fonua believed that Tovar had been injured from the officers' bullets, but he thought Tovar was still a threat to safety because he believed that Tovar may still have been armed with a

gun. *Id.* at 46–48.  Fonua also believed that Tovar was "actively resisting" because he did not comply with Fonua's commands for the two minutes prior to releasing the K-9.  *Id.* at 51.  Fonua thought Tovar was capable of complying with commands because he saw Tovar move his head twice and heard noises, but he could not tell what the noises were.  *Id.* at 50–51, 60.  Based on these observations, Fonua considered Tovar an "imminent danger to everyone on the scene," but he testified that deadly force was not justified in that moment.  *Id.* at 51–52.

Fonua proceeded to release his K-9, with the intent to see Tovar show compliance by presenting his hands.  *Id.* at 66–67.  Fonua watched the K-9 attack Tovar for two minutes and forty second while Tovar laid on the ground.  *Id.* at 77, 82.  Fonua was trained that his dog's bite can cause lacerations, bruises, tear muscles and fracture bones and believed that there is "almost always" a reaction to his dog's bite.  *Id.* at 70, 77.  Fonua observed Tovar not reacting to the K-9 attack.  *Id.* at 70.

At some point during the two-minute-forty-second K-9 attack, Fonua concluded that Tovar's injuries were so severe that he was unable to comply with the verbal commands.  *Id.* at 79–80.  However, Fonua still did not recall his K-9.  *Id.* at 80–81.  Fonua only recalled the K-9 when he thought officers "were ready to move on to the next step," i.e., when the officers were ready to handcuff and search Tovar.  *Id.* at 81.

### F.    Jimenez's Testimony

Jimenez entered the courtyard after Tovar was shot and lying face down on the ground. Dep. of Mauricio Jimenez ("Jimenez Dep.") 51, ECF No. 82-1.  Jimenez saw Jorgensen pointing his rifle at Tovar.  *Id.*  Jimenez believed that there was a back and forth shooting between Tovar and the officers, but he only saw Tovar on the ground and none of the officers told him that Tovar had fired a weapon.  *Id.* at 52–54.  Fonua asked Jimenez if it was okay to send the K-9, and Jimenez indicated that Fonua could release the K-9 after giving a few more commands, under the belief that Tovar could potentially have a firearm.  *Id.* 66–67, 70.  During the attack, Jimenez did not notice Tovar reacting very much.  *Id.* at 72–93.  It took Jimenez over two minutes to realize that Tovar could not comply with any demands because he was dying.  *Id.* at 74–75.

## II.    LEGAL STANDARD

### A.    Motion for Summary Judgment

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment only when the moving party shows that there is no genuine dispute of material fact.  A genuine dispute exists if there is sufficient evidence such that a reasonable fact finder could decide in favor of the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And that dispute is material if it might affect the outcome of the suit.  *Id.*  In determining if a genuine dispute of material fact exists, a court must "tak[e] the evidence and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party."  *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011).

The moving party bears the burden of persuading the Court that there is no genuine dispute of material fact, and it also bears the initial burden of producing evidence that demonstrates there is no dispute.  *Cunningham v. Medtronic, Inc.*, 2018 WL 4053446, at *2 (N.D. Cal. Aug. 24, 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  When the moving party bears the ultimate burden of persuasion, its initial burden of production is to "establish 'beyond controversy every essential element of'" its claim or defense.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (citation omitted).  If the moving party satisfies this initial burden, the nonmoving party can nonetheless defeat summary judgment by showing "the evidence, taken as a whole, could lead a rational trier of fact to find in its favor."  *Id.*

### B.    Motion to Strike Expert Opinion

Courts act as the gatekeeper of expert testimony to ensure that such testimony is reliable and relevant under Federal Rule of Evidence 702.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The proponent of expert testimony has the burden of proving admissibility.  *In re Korean Ramen Antitrust Litig.*, 281 F. Supp. 3d 892, 931 (N.D. Cal. 2017) (citations omitted).  Before an expert can offer her opinions, she must be qualified by "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  Once she is qualified, Rule 702 permits her to testify as long as "(a) the expert's

United States District Court
Northern District of California

1   scientific, technical, or other specialized knowledge will help the trier of fact to understand the

2   evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

3   the testimony is the product of reliable principles and methods; and (d) the expert's opinion

4   reflects a reliable application of the principles and methods to the facts of the case." *Id.* This

5   multifactor inquiry is flexible, and "Rule 702 should be applied with a 'liberal thrust' favoring

6   admission." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1232 (9th Cir. 2017) (citations

7   omitted). Although courts must screen expert testimony for reliability, what they assess "is not the

8   correctness of the expert's conclusions but the soundness of his methodology." *City of Pomona v.*

9   *SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir.

10  2010)).

## III.   PLAINTIFFS' MSJ

12          The Court begins with Plaintiffs' MSJ before turning to Defendant's Cross-MSJ and

13  Plaintiffs' *Daubert* Motion.[2]

14          The Court will examine in turn Plaintiffs' motion for summary judgment against Soh,

15  Lopez, and Fonua for (1) excessive force and (2) negligence, as well as the City's vicarious

16  liability for Officer Defendants' negligence under California state law.

### A.   Excessive Force

18          "Section 1983 imposes liability upon any person who, acting under color of state law,

19  deprives another of a federally protected right." *Karim-Panahi v. Los Angeles Police Dep't*, 839

20  F.2d 621, 624 (9th Cir. 1988). A Section 1983 plaintiff must prove two elements: (1) the

21  defendants acted under color of state law, and (2) the defendants deprived plaintiff of a right

22  secured by the Constitution or federal statutes. *Id.*

23          For Section 1983's second element, Plaintiffs' causes of action for excessive force arise

24  under the Fourth Amendment and its prohibition on unreasonable seizures. *See Graham v.*

25  *Connor*, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under § 1983,

26

27  ───────────────
    [2] Defendants do not rely on Borden's opinions in their Cross-MSJ, thus the Court will address
    Plaintiffs' *Daubert* Motion last.

analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.").

To determine whether the force used by officers was excessive, the court must "assess whether it was objectively reasonable 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'" *Gregory v. Cty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting *Graham*, 490 U.S. at 397). The reasonableness of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and its assessment "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97. However, because this record includes video recordings of the incident, the court must "view[ ] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007).

In the Ninth Circuit, excessive force claims are analyzed in three steps as articulated in *Glenn v. Washington County*, 673 F.3d 864, 871 (9th Cir. 2011). First, the court must assess "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type and amount of force inflicted.'" *Id.* (quoting *Espinosa v. City & Cty. of San Francisc*o, 598 F.3d 528, 537 (9th Cir. 2010)). Second, the court must evaluate the government's interest in the use of force. *Id.* Third, the court must "'balance the gravity of the intrusion on the individual against the government's need for that intrusion.'" *Id.* (quoting *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003)).

Since the balancing by which a Fourth Amendment excessive force claim is examined "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, . . . summary judgment or judgment as a matter of law . . . should be granted sparingly." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003).

1    The Court will separately analyze whether Soh and Lopez's use of firearms and Fonua's

2    K-9 deployment were excessive under the Fourth Amendment.

3                    **1.    Defendants Soh and Lopez's Use of Firearms**

4    The Court finds that, while the severity of the intrusion weighs in Plaintiffs' favor, the

5    government's interest, particularly the questions of whether a reasonable officer would perceive an

6    immediate threat to safety or risk of escape, presents genuine disputes of material fact that

7    preclude summary judgment against Soh and Lopez.

8                        **a.    Severity of the Intrusion**

9    The "use of deadly force implicates the highest level of Fourth Amendment interests both

10   because the suspect has a 'fundamental interest in his own life' and because such force 'frustrates

11   the interest of the individual, and of society, in judicial determination of guilt and punishment.'"

12   *A.K.H. ex rel. Landeros v. City of Tustin*, 837 F.3d 1005, 1011 (9th Cir. 2016) (quoting *Garner*,

13   471 U.S. at 9).

14   Here, Soh and Lopez both used firearms to shoot Tovar, which Defendants concede is

15   "unquestionably [] the highest level of force."  Cross-MSJ 10.  Therefore, the Court finds that the

16   level of force here is severe.

17                        **b.    Government Interest**

18   Examining the government's interest "requires a careful balancing of the nature and quality

19   of the intrusion on the individual's Fourth Amendment interests against the countervailing

20   governmental interests at stake."  *Graham*, 490 U.S. at 396.  Careful attention must be paid to the

21   facts and circumstances of each particular case, including the following factors: the severity of the

22   crime at issue; whether the suspect poses an immediate threat to the safety of the officers or

23   others; and whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

24   *Gregory*, 523 F.3d at 1106.

25   The "most important" of the *Graham* factors is "whether the suspect posed an immediate

26   threat to the safety of the officers or others."  *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

27   In determining whether there was an immediate threat to safety, the Court must consider "the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    totality of the circumstances . . . from the perspective of a 'reasonable officer on the scene.'"

2    *Plumhoff v. Rickard*, 572 U.S. 765, 774–75 (2014) (quoting *Graham*, 490 U.S. at 396)).  In doing

3    so, the Court recognizes "that police officers are often forced to make split-second judgments—in

4    circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

5    necessary in a particular situation."  *Id.* at 775.

6           As an initial matter, regarding the severity of the crime at issue, Plaintiffs concede that

7    Tovar was suspected of serious felonies, and therefore this consideration would weigh in

8    Defendants' favor.  MSJ 19.

9           Regarding the risk of immediate threat to safety and active resistance, Plaintiffs' argument

10   is simple and supported by the video evidence: Tovar posed no immediate threat to safety and was

11   not actively resisting arrest when Soh and Lopez shot Tovar because he had already been shot and

12   had fallen face down to the ground before Soh and Lopez even fired their first shot.  MSJ 18–21.

13   A reasonable jury could view this video evidence and conclude that Soh and Lopez had no

14   reasonable basis to use deadly force at that time.

15          However, Defendants argue that Soh and Lopez reasonably believed under the totality of

16   the circumstances that Tovar posed an immediate threat to the officers and was actively resisting

17   arrest at the time they used deadly force.  Cross-MSJ 9–14.  Prior to entering the apartment

18   complex, Soh and Lopez were both briefed that Tovar was likely armed and willing to shoot

19   police, and Soh remembers hearing on the radio that Tovar was reaching into his waistband before

20   Soh was able to see Tovar.  Soh Dep. 63; Lopez Dep. 29–35.  Soh and Lopez did not see Tovar

21   when they first heard the gunshots, so they did not know it was Jorgensen and not Tovar who fired

22   the shots.  Soh Dep. 65; Lopez Dep. 92–93.  Soh also remembered hearing on the radio that Tovar

23   was reaching into his waistband before he saw him.  Soh Dep. 63.  When Tovar came into Soh and

24   Lopez's line of sight, both officers perceived Tovar making "furtive movements," causing them to

25   believe that Tovar would either fire at them or Jorgensen.  Soh Dep. 53–56; Lopez Dep. 93.  Soh

26   described Tovar making a twisting movement to face the wall, away from officers, which a jury

27   could potentially see in the video evidence, and Lopez described seeing an object in Tovar's hand

28   Case No.:  5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION

that Tovar then brought in a downward motion, which is not clearly depicted in the video evidence. *Id.* The officers both testified that they believed Tovar was still standing when they shot him. Soh Dep. 56; Lopez Dep. 99–101.

When examining the facts as depicted in the video and all other facts in the light most favorable to Defendants, the Court finds that disputed facts preclude summary judgment. The Court observes that all shots were fired in 3.58 seconds, during which time the video evidence depicts a "tense, uncertain, and rapidly evolving" situation. *Graham*, 490 U.S. at 396–97; *see also* Dr. Begault's Rule 26 Report 3, Table I. While it is undisputed that Tovar was in fact on the ground when Soh and Lopez opened fire, less than one second passed between Jorgensen's last shot and Soh and Lopez's first shots. *See* Dr. Begault's Rule 26 Report 3, Table I. A jury could find that a reasonable officer on the scene would not have been able to fully appreciate and react to Tovar falling to the ground in that short of a time span. In doing so, a jury could also find that deadly force was warranted because a reasonable officer could have believed that Tovar made a furtive motion toward his waist, or that Tovar had been previously engaged in a gunfight with Jorgensen before Soh and Lopez could see Tovar.

Ultimately, the totality of the circumstances here reveals disputed facts that must be resolved by a jury. This case involves a shooting death that occurred over a short period of time, involved multiple officers, was captured on several video devices at different angles, and elicited several different officer statements—some of which are not supported by the video evidence. Under these circumstances, it is for a jury to review this evidence and resolve factual disputes as to whether a reasonable officer in Soh and Lopez's position would have perceived Tovar as an immediate threat to safety, including whether a reasonable officer would have known that Jorgensen already shot Tovar before they opened fire, or would have known that Tovar was not making a furtive movement. Accordingly, the Court finds that disputed facts preclude summary judgment as to Soh and Lopez's use of force.

### 2. Defendant Fonua's Use of K-9

Fonua's use of his K-9 presents a different situation. The Court finds that Fonua's

United States District Court
Northern District of California

1    deployment of his K-9 for two minutes and forty seconds constituted excessive force as a matter

2    of law.

3                              a.        **Severity of Intrusion**

4          Court analyze the severity of the intrusion for K-9 attacks by examining the "specific

5    factual circumstances" of the case.  *Lowry v. City of San Diego*, 858 F.3d 1248, 1256–57 (9th Cir.

6    2017).  For example, in *Smith v. City of Hemet*, the Ninth Circuit held that the Fourth Amendment

7    intrusion was "severe" when officers pepper-sprayed the plaintiff four times and deployed the

8    police dog on him three times.  394 F.3d 689, 701–02 (9th Cir. 2005) (en banc).  The Ninth Circuit

9    in that case even left open the possibility that a K-9 attack could constitute deadly force.  *Id.* at 707

10   ("[W]hile we have not in any of our prior cases found that the use of police dogs constituted

11   deadly force, we have never stated that the use of such dogs cannot constitute such force.").  In

12   *Miller v. Clark County*, the Ninth Circuit found that "ordering a police dog to bite a suspect's arm

13   or leg *and permitting the dog to continue biting for up to one minute*, an unusually long bite

14   duration," constitutes a "serious" intrusion.  *Miller v. Clark Cnty.*, 340 F.3d 959, 962 (9th Cir.

15   2003) (emphasis in original).

16         Here, after officers fired fifteen shots from automatic rifles at Tovar and Tovar lay nearly

17   motionless on the ground for over two minutes, the K-9 was released to attack Tovar for two

18   minutes and forty seconds.  The video footage shows the K-9 repeatedly biting, tearing, and

19   dragging Tovar's body across the floor while several officers stood watching with their rifles

20   pointed at Tovar.  The video evidence does not show Tovar noticeably reacting to the K-9's attack,

21   and Tovar and was pronounced dead on the scene.

22         The Court finds this intrusion severe.  A K-9 attack of this duration, while the suspect lay

23   wounded and nearly motionless, is without precedent—Defendants have failed to cite a single case

24   where a court examined the level of intrusion for a K-9 attack lasting over two minutes of a

25   suspect who had already been shot.  *See, contra, Miller*, 340 F.3d at 962 (K-9 attack lasting nearly

26   one minute); *Hernandez v. Town of Gilbert*, No. CV-17-02155-PHX-SMB, 2019 WL 1557538, at

27   *4 (D. Ariz. Apr. 10, 2019), aff'd, 989 F.3d 739 (9th Cir. 2021) (K-9 attack lasting 50 seconds).

28   Case No.: 5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
                                        14

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Under these circumstances, the K-9 attack may even be considered deadly force.  Indeed, Tovar

2    was pronounced dead on the scene.  While neither party has presented evidence of the cause of

3    death, at the very least, it is conceivable that injuries sustained from multiple gunshot wounds

4    would more likely lead to death or serious injury after a K-9 attack of this duration.  *Hemet*, 394

5    F.3d at 706 (defining "deadly force" as "creating a substantial risk of death or serious bodily

6    injury").

7         The Court therefore finds that the Fonua's deployment of the K-9 for over two and a half

8    minutes constituted a severe intrusion.

9                              **b.     Government Interest**

10        Moving to the government's interest, the Court finds that, while Tovar's suspected crime

11   was undisputably serious, no reasonable officer could have concluded that Tovar presented an

12   immediate threat to safety or risk of escape either (1) at the time of deployment, or (2) at any point

13   throughout the two-minute-forty-second attack.

14                         **i.     Observations Prior to K-9 Deployment**

15        Fonua relies on the following facts to argue that any reasonable officer would have

16   believed Tovar posed an immediate threat to safety or risk of escape when Fonua released his K-9.

17   Fonua arrived on the scene with the understanding that Tovar had a serious criminal history, was

18   likely armed, and was attempting to escape.  Cross-MSJ 15.  Fonua heard gunshots prior to

19   approaching Tovar and believed that Tovar was armed and had engaged in a gun fight with

20   officers.  *Id.*  While Tovar was down for those two minutes prior to the K-9 deployment, Fonua

21   gave Tovar repeated commands to not move and to show his hands, but Tovar did not comply.  *Id.*

22   at 16.  Fonua thought that Tovar was capable of complying with commands because he saw Tovar

23   make movements, such as lifting his head for ten seconds, and he heard Tovar make some

24   unidentifiable noises.  *Id.*  Because he believed Tovar was armed and actively resisting commands,

25   Fonua released his K-9 with the intent to make Tovar comply with commands.  *Id.*

26        Even accepting these facts as true and viewing all facts in the light most favorable to

27   Fonua, the Court finds that no reasonable officer would have believed that Tovar posed an

28   Case No.: 5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
                                        15

United States District Court
Northern District of California

1    immediate threat to safety or risk of escape at the time Fonua deployed his K-9.  First, Fonua did

2    not identify, and the video evidence does not depict, any type of movement or sound that would

3    have indicated Tovar posed an immediate threat to safety or risk of escape prior to K-9

4    deployment.  Tovar did not, for example, reach toward his waist, make a sudden movement

5    toward the officers, attempt to stand up, or communicate in any way with the officers.  Second,

6    regardless of whether it was reasonable to believe that Tovar was armed, any reasonable officer

7    would have observed Tovar's unresponsiveness and realized that Tovar was incapable of posing a

8    threat because he had been shot by other police officers.  Finally, while it may have been

9    reasonable to believe that Tovar was armed and engaged in a gunfight before Fonua arrived on the

10   scene, Fonua had time to assess the situation prior to releasing his K-9.  Fonua's choice to deploy

11   the K-9 was not a split-second decision in the heat of a tense, uncertain, and rapidly evolving

12   situation.  Instead, while multiple armed officers surrounded Tovar's body with their rifles pointed

13   at him, Fonua had over two minutes to observe Fonua's injuries, observe his inability to follow

14   commands, observe that no officer had been injured, realize that no officer indicated that Tovar

15   had opened fire, and reflect on whether any force would be appropriate prior to releasing the K-9.

16   Fonua still chose to deploy a K-9 on a mortally wounded and unresponsive suspect.

17        Based on these undisputed facts, the Court finds that there was no objectively reasonable

18   threat to safety or risk of escape at the time Fonua deployed the K-9.

19                        **ii.        Observations During K-9 Attack**

20        But regardless of the circumstances under which Fonua released the K-9, there was

21   certainly no reasonable basis to allow the K-9 to continuously attack Tovar for two minutes and

22   forty seconds.

23        As an initial matter, the Court emphasizes Fonua's testimony that he realized Tovar did not

24   pose an immediate threat to safety or risk of escape that justified the continued deployment of the

25   K-9 at some point during the K-9 attack, yet he allowed the K-9 to continue its attack.  Fonua Dep.

26   79–81.

27        However, notwithstanding Fonua's subjective intent, the Court finds no facts in the record

28   Case No.:  5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION

upon which a reasonable officer could have believed that Tovar posed a threat or risk of escape throughout the attack.  Defendants argue that Tovar made movements while being attacked that indicated Tovar was a threat to safety, including "clenching his fists, grabbing the railing, and making noise."  Cross-MSJ 5.  But notably, Defendants never suggest that Fonua observed this behavior.  *See id.* (citing Lopez and Jimenez's depositions and Lopez's BWC).  And further, the video evidence does not support Defendants' characterization of Tovar's movements while being attacked.  To the contrary, the video evidence depicts Tovar continuing to lay on the floor unresponsive and silent while being attacked by the K-9 for two minutes and forty seconds.  At no point did Tovar scream, yell, kick, resist, or fight back in any way.  Even as the K-9 repeatedly bit down on Tovar, thrashing his head and dragging Tovar's body down the hall, Tovar remained noticeably unresponsive on the video.  But even if Fonua did in fact observe Tovar "clenching his fists, grabbing the railing, and making noises," and the video evidence supported this testimony, none of these movements would give a reasonable officer a reason to believe that Tovar posed an immediate threat to safety or risk of escape.  The officers were in control of Tovar, and there are no allegations that Tovar made, for example, any furtive motion, sudden movements, or threatening verbal response.

Ultimately, the Court finds that no reasonable jury could watch the attack in this video evidence and conclude that a reasonable officer could have possibly believed that Tovar posed an immediate threat to safety or risk of escape throughout the entire violent two minute and forty second attack.

### c.   Balancing

The final step of the Court's analysis balances the severity of the intrusion with the government interest, whereby the core consideration is reasonableness.  *Graham*, 490 U.S. at 397.

As discussed above, the intrusion here is severe—possibly even severe enough to constitute deadly force considering Tovar's injuries prior to the K-9 attack and the needlessly excessive duration of the K-9 attack.  Considering the severity of the intrusion, the Court finds that the government's interest did not justify the use of force here.  While Tovar had a serious criminal

United States District Court
Northern District of California

1    history and was suspected of serious crimes, a serious criminal history alone cannot justify the

2    force used here.  After Tovar had been shot and Fonua observed Tovar lying on the ground largely

3    unresponsive for over two minutes, it was undisputably unreasonable to deploy a K-9 and allow

4    that K-9 to attack an unresponsive Tovar for two minutes and forty seconds.

5                                                    * * *

6         Therefore, the Court **DENIES** Plaintiffs' motion for summary judgment on their excessive

7    force claims against Soh and Lopez.  The Court finds that a jury must resolve disputed facts

8    regarding the reasonableness of Soh and Lopez's use of force.  However, the Court **GRANTS**[3]

9    Plaintiffs' motion for summary judgment on their excessive force claims against Fonua.  The

10   Court finds as a matter of law that Fonua used excessive force in violation of the Fourth

11   Amendment.

12        **B.**     **Negligence**

13        Moving to Plaintiffs' negligence claims, the Court will address Plaintiffs' claims against

14   Soh, Lopez, and Fonua before turning to their claims against the City.

15             **1.**     **Officer Defendants**

16        "[P]ublic employees in California are statutorily liable to the same extent as private

17   persons for injuries caused by their acts or omissions."  *Hayes v. Cty. Of San Diego*, 57 Cal. 4th

18   622, 628–29 (Cal. 2013).  Thus, to support a negligence finding, a plaintiff must show that the

19   defendant public employee had a duty to exercise due care, that he breached that duty, and that the

20   breach was the proximate or legal cause of the resulting injury.  *Id.*  An officer's intentional

21   shooting death of an individual may give rise to negligence liability where the officer failed to

22   exercise due care.  *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 534 (Cal. 2009) (citing *Munoz v.*

23   *Olin*, 24 Cal. 3d 629, 624 (Cal. 1979)).  The California Supreme Court "has long recognized that

24   peace officers have a duty to act reasonably when using deadly force," whereby "[t]he

25   reasonableness of an officer's conduct is determined in light of the totality of circumstances."

26

27   ─────────────────
     [3] This finding is made in consideration with Defendants' qualified immunity defense discussed in
     the section below.

28

1    *Hayes*, 57 Cal. 4th at 629.

2        This inquiry overlaps with the Fourth Amendment analysis above in that it turns on the

3    reasonableness of Officer Defendants' use of force.  *See, e.g., Hernandez v. City of Pomona*, 46

4    Cal. 4th 501, 514 (Cal. 2009) (applying Fourth Amendment excessive force standard to California

5    negligence claim).  Neither party suggests that the California negligence standard differs from that

6    analysis in any way material to this case.

7        Regarding Soh and Lopez, the Court finds genuine disputes of material fact preclude a

8    finding that Soh and Lopez's conduct was unreasonable or in breach of their duty to exercise due

9    care.  For all the reasons discussed above, it is for the jury to decide whether Soh and Lopez acted

10    as any reasonable officer would under the totality of these circumstances.

11        In contrast, for all the reasons discussed above, the Court finds that Fonua had no

12    reasonable basis to deploy his K-9 and allow the K-9 to attack for two minutes and forty seconds

13    under these circumstances, and his failure to exercise due care caused Tovar to unnecessarily

14    suffer a severe and extended K-9 attack.  Therefore, the Court finds that Fonua's excessive force

15    also constitutes negligence.

16                            **2.    The City**

17        Under California law, "municipalities enjoy no special immunity" for the negligence of its

18    employees, and a municipality is vicariously liable for the negligence of its employees to the same

19    extent that the employees would be liable individually.  *Hernandez v. City of San Jose*, No. 16-

20    CV-03957-LHK, 2016 WL 5944095, at *45–46 (N.D. Cal. Oct. 13, 2016) (citing Cal. Gov. Code

21    § 815.2(a)).

22        Plaintiffs argue that, should the Court grant summary judgment on their negligence claim

23    against an Officer Defendant, the City is also vicariously liable for their negligence pursuant to

24    California Government Code section 815.2.  MSJ 25.  Defendants did not acknowledge or offer a

25    response to Plaintiffs' argument regarding Section 815.2.

26        Because the Court found Fonua acted negligently in the deployment of his K-9, and Fonua

27    was employed by the City when he engaged in this negligent conduct, the Court also finds the City

28

United States District Court
Northern District of California

1    vicariously liable for Tovar's negligence pursuant to California Government Code section 815.2.

2                                                  * * *

3           Therefore, the Court **DENIES** Plaintiffs' motion for summary judgment on their

4    negligence claims against Soh and Lopez and **GRANTS** Plaintiffs' motion for summary judgment

5    on their negligence claim against Fonua and the City.

6    **IV.     DEFENDANTS' CROSS-MSJ**

7           Defendants move for summary judgment on all claims.  As an initial matter, in their

8    opposition to Defendants' Cross-MSJ, Plaintiffs concede to the dismissal of their *Monell* claim

9    against the City, the Estate's survival claim for the Fourteenth Amendment, the Fourteenth

10   Amendment claims against Jorgensen, the Fourteenth Amendment denial of serious medical need

11   claims, and the supervisory claims.  Pls.' Reply 15 n.2.  Therefore, the Court **DISMISSES** these

12   claims with prejudice.

13          Because Plaintiffs have conceded to the dismissal of various claims and the Court has

14   resolved the Fourth Amendment and negligence claims against three Officer Defendants when

15   viewing all facts in the light most favorable to those Defendants, the Court will only address

16   Defendants' remaining arguments regarding qualified immunity and Plaintiffs' state law claims.

17          **A.      Qualified Immunity**

18          "The defense of qualified immunity protects 'government officials performing

19   discretionary functions . . . from liability for civil damages insofar as their conduct does not

20   violate clearly established statutory or constitutional rights of which a reasonable person would

21   have known.'"  *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) (quoting *Harlow v.*

22   *Fitzgerald*, 457 U.S. 800, 818, (1982)).  It "gives ample room for mistaken judgments by

23   protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v.*

24   *Bryant*, 502 U.S. 224, 229 (1991).  The doctrine also "balance[s] two important, competing

25   interests: the need to hold public officials accountable for irresponsible actions, and the need to

26   shield them from liability when they make reasonable mistakes." *Morales v. Fry*, 873 F.3d 817,

27   822 (9th Cir. 2017).

28   Case No.: 5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
                                               20

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). The district court has "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Id.* A failed showing of either prong results in immunity to the official. *N.E.M. v. City of Salinas*, No. 5:14-cv-05598-EJD, 2017 WL 5128008, at *6 (N.D. Cal. Nov. 6, 2017) (citing *White v. Pauly*, 137 S.Ct. 548, 551 (2017)). For this qualified immunity analysis, the Court reviews the facts in the plaintiff's favor, but the plaintiff bears the burden to show that the law is "clearly established" against the defendants. *Saucier*, 533 U.S. 194, at 201 (2001); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1059–60 (9th Cir. 2006).

Defendants argue that qualified immunity protects all Officer Defendants from liability for Plaintiffs' Fourth Amendment and Fourteenth Amendment claims. The Court will address each constitutional violation in turn.

### 1.    Fourth Amendment

The Court finds that qualified immunity does not shield Defendants from liability for Plaintiffs' Fourth Amendment claims under these circumstances, as Plaintiffs have presented facts by which a jury could find a violation of a clearly established constitutional right.

### a.    Step One: Violation of Constitutional Right

The Court previously identified the facts upon which a reasonable jury could find that the use of force by Soh and Lopez violated the Fourth Amendment—a reasonable jury could view the video evidence and find that a reasonable officer should have known that Tovar had been shot and fallen to the ground prior to firing their rifles. The Court also found as a matter of law that Fonua's deployment of the K-9 under these circumstances violated the Fourth Amendment. Thus, for those same reasons, the Court finds step one satisfied as to Soh, Lopez, and Fonua.

In addition to Soh, Lopez, and Fonua, Defendants also seek a finding of qualified immunity for Defendants Jorgensen and Jimenez. For the reasons stated below, the Court

1    similarly finds facts upon which a reasonable jury could conclude that the use of force by

2    Jorgensen and Jimenez violated the Fourth Amendment.

3                    **i.        Jorgensen's Use of Firearms**

4            To reiterate, courts in the Ninth Circuit examine excessive force claims by considering the

5    severity of the intrusion, the government's interest, and the balance between the two.  *Gregory v.*

6    *Cty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting *Graham*, 490 U.S. at 397).   In

7    considering the government's interest, courts analyze the seriousness of the crime, the immediate

8    threat to safety, and whether the suspect was actively resisting or attempting to flee.  *Id.*  The most

9    important factor is whether, under the totality of the circumstances, a reasonable officer would

10   have perceived an immediate threat to safety.  *Id.*

11           The Court finds that Plaintiffs have identified facts which, when viewed in the light most

12   favorable to Plaintiffs, a jury could find a Fourth Amendment violation.

13           A reasonable jury could view the video evidence and see Jorgensen shoot an unarmed

14   suspect six times as he ran away on the second floor above Jorgensen.  Even considering the

15   undisputed facts that Tovar had a serious criminal history and was actively attempting to flee, a

16   reasonable jury could find that there was no immediate threat to safety that justified an intrusion as

17   severe as deadly force under these circumstances.

18           Defendants' arguments on this point erroneously rely on disputed facts viewed in the light

19   most favorable to Defendants.  While Jorgensen believed that Tovar looked at him and "reached

20   into his waistband," or at least made a motion to suggest he was going to pull out a firearm,

21   referred to as a "furtive motion," these are disputed facts that are not necessarily supported by the

22   video evidence.  Cross-MSJ 4, 11, 18.  As an initial matter, the video evidence does not show

23   Tovar reaching into his waistband and pulling out an object, as Defendants suggest.  *Id.* at 18.

24   This contradiction could reasonably lead a jury to find Jorgensen's account incredible.  Further, a

25   reasonable jury could interpret Tovar's movement in the video as a natural part of running, or a

26   way to hold up his pants as he ran.  A reasonable jury could also consider the undisputed fact that

27   Tovar did not in fact have a gun on his body, and it could weigh that fact against Jorgensen's

28   Case No.: 5:21-cv-02497-EJD

United States District Court
Northern District of California

1   testimony that Tovar reached into his waistband or made an action suggesting that he was reaching

2   for a gun.  *Dominguez v. City of San Jose*, 2023 WL 2717266 (March 29, 2023) (citing *Cruz v.*

3   *City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014)).  In other words, there is circumstantial

4   evidence that would give a reasonable jury considerable pause, the most obvious of which is, if

5   Tovar "didn't have a gun on him" and "probably saw that he was surrounded by officers with guns

6   drawn," then "why would he have reached for his waistband?"  *Cruz v. City of Anaheim*, 765 F.3d

7   1076, 1079 (9th Cir. 2014).

8          Therefore, when viewing these facts in the light most favorable to Plaintiffs, the Court

9   finds that a reasonable jury could conclude that Jorgensen used excessive force in violation of the

10  Fourth Amendment.

11                    **ii.       Jimenez's Use of the K-9**

12         The Court also finds that Plaintiffs have identified facts which a reasonable jury could find

13  that Jimenez's conduct violated the Fourth Amendment.[4]

14         A reasonable jury could view the video evidence and determine that Jimenez, similar to

15  Fonua, unnecessarily authorized the deployment of a K-9 for two minutes and forty seconds on a

16  severely wounded suspect who laid motionless and unresponsive face down on the ground.  Even

17  considering the undisputed facts that Tovar had a serious criminal history, for all the reasons

18  discussed above in the Court's analysis of Fonua, a reasonable jury could find that Tovar was not

19  actively attempting to flee and there was no immediate threat to safety that justified an intrusion as

20  severe as the excessively long K-9 attack under these circumstances.

21         Defendants' arguments on this point also erroneously rely on disputed facts viewed in the

22  light most favorable to Defendants.  For example, Defendants argue that prior to the K-9 attack,

23  Tovar raised his head twice, once for ten seconds "as if he were looking around."  Cross-MSJ 4.

24  But another more reasonable interpretation of this movement could be that Tovar was a severely

25

26  ────────────────────
27  [4] Jimenez's facts are similar to Fonua's discussed above, but Plaintiffs did not seek summary
    judgment as to its claims against Jimenez, so the Court repeats those facts relevant to Jimenez
    here.

28  Case No.: 5:21-cv-02497-EJD
    ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
                                          23

United States District Court
Northern District of California

wounded person moving in agony rather than a person posing an immediate threat to safety or risk of escape. Defendants also argue that Jimenez was unaware of what transpired prior to entering the scene, and Jimenez believed Tovar had "exchanged" fire with officers. *Id.* at 5. However, a jury could also find no reasonable basis for this belief given that Jimenez received no information that Tovar had opened fire at any point. Further, while Jimenez did not have the same opportunity as Fonua to observe Tovar for the full two minutes and eighteen seconds that he laid largely unresponsive prior to deploying the K-9, a reasonable jury could find that Jiminez had sufficient information to know that Tovar had been shot and posed no threat to safety. For example, as the Court discussed in its analysis of Fonua, Tovar appeared obviously injured and unresponsive in the video, Tovar was surrounded by officers pointing rifles at Tovar, and Jiminez did not observe Tovar make any furtive motions suggesting he was reaching for a weapon. A reasonable officer would have seen that Tovar posed no threat under these circumstances. And further, again here, even if a reasonable officer could have believed that Tovar posed an immediate threat to safety or risk of escape at the time of the K-9 deployment, there is sufficient evidence for a reasonable jury to find that Tovar posed no such threat throughout the two minutes and forty seconds that he was attacked. A reasonable jury could find that it should have been obvious to Jimenez that Tovar did not comply with commands because he was dying.

Therefore, even when viewed in the light most favorable to Defendants, the Court finds that a reasonable jury could conclude that Jimenez used excessive force in violation of the Fourth Amendment.

### b.    Step Two: Clearly Established Right

Having determined that a reasonable jury could find a Fourth Amendment violation as to all Officer Defendants, the burden now shifts to Plaintiffs to show that the constitutional rights implicated here were clearly established at that time. The Court finds that Plaintiffs have met that burden. Namely, Plaintiffs have identified "disputed factual issues that are necessary to a qualified immunity decision [which] must first be determined by the jury before the court can rule on qualified immunity." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (internal

quotation marks omitted) (quoting *Morales v. Fry*, 873 F.3d 817, 824 (9th Cir. 2017)).

First, it is clearly established law that people have the right to be free from deadly force by the police when they do not pose a threat to safety.  *See Tennessee*, 471 U.S. at 11.  While it is true that general constitutional doctrines are insufficient to place an officer on notice that specific conduct is unconstitutional, in situations where a reasonable officer's perception of a threat will depend in part on whether a suspect made a motion to suggest they are going to fire a weapon, referred to as a "furtive motion," and how to reasonably interpret that motion, courts generally do not grant qualified immunity.  *See, e.g., S.R. Nehad v. Browder*, 929 F.3d 1125, 1140 (9th Cir. 2019) (finding genuine disputes of material fact regarding immediate threat to safety precluded grant of summary judgment on qualified immunity); *Estate of Lopez v. Gelhaus*, 871 F.3d 998, 1011 (9th Cir. 2017) (denying qualified immunity to officer that shot a man holding an AK47 where dispute of fact is gun was raised at an officer); *Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (denying qualified immunity to officer that shot a man holding a submachine gun where there was a dispute of fact regarding whether the gun was raised at an officer); *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir. 2003) ("Where the officers' entitlement to qualified immunity depends on the resolution of disputed issues of fact in their favor, and against the non-moving party, summary judgment is not appropriate."); *see also, e.g., Banks v. Mortimer*, 620 F. Supp. 3d 902, 929 (N.D. Cal. 2022) (denying qualified immunity because of disputed facts regarding whether police officer saw fleeing arrestee with gun before fatally shooting him); *Nunez v. City of San Jose*, 381 F. Supp. 3d 1192, 1212 (N.D. Cal. 2019) (denying qualified immunity "because both parties' arguments depend on whether or not [the suspect] had a gun and pointed it at the officers at the time he was shot, and the Court has already found a genuine material dispute as to those facts"); *S.T. by & through Niblett v. City of Ceres*, 327 F. Supp. 3d 1261, 1279–80 (E.D. Cal. 2018) (same).

The Court finds the Ninth Circuit's analysis on this issue in *Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014), instructive.  In *Cruz*, the officers were informed that the decedent was a known gang member who sold methamphetamine, carried a gun, had prior convictions

United States District Court
Northern District of California

including a felony involving a firearm, and had made it clear to an informant that he "was not going back to prison." *Id.* at 1077–78.  The officers pulled the decedent over during a traffic stop and surrounded him with their vehicles to make an arrest. *Id.* at 1078.  The decedent attempted to escape, backing his SUV into one of the marked patrol cars in the process. *Id.*  The decedent eventually stopped backing up his SUV, and the officers got out of their vehicles with their weapons drawn yelling commands for him to get on the ground. *Id.*  The decedent then opened his door and, according to the officers' testimony, reached for the waistband of his pants. *Id.*  Fearing that he was reaching for a gun, five officers opened fire and killed the decedent. *Id.*  They later found no weapon on the decedent's body. *Id.*  The court reversed the district court's grant of the officers' motion for summary judgment on an excessive force claim, finding that a reasonable jury could have concluded that the decedent did not reach for his waistband, in which case, a jury could find the officers' use of deadly force clearly excessive. *Id.* at 1079–80.  Specifically, the Court held:

> It would be unquestionably reasonable for police to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even if he reaches there for some other reason. Given Cruz's dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire. Conversely, if the suspect doesn't reach for his waistband or make some similar threatening gesture, it would clearly be unreasonable for the officers to shoot him after he stopped his vehicle and opened the door. At that point, the suspect no longer poses an immediate threat to the police or the public, so deadly force is not justified.

*Id.*

Here, Tovar was also a known gang member with prior felony convictions believed to have been carrying a gun who had attempted a dangerous escape.  Similar to the officers in *Cruz*, Jorgensen, Soh, and Lopez all justify their shooting in large part on their belief that Tovar reached for his waistband in a way that made them believe he would pull out a gun.  And similar to the decedent in *Cruz*, the officers did not recover a gun on Tovar's body after the shooting.[5]  If a jury

---

[5] While "[t]here need not be a prior case directly on point, so long as there is precedent placing the statutory or constitutional question beyond debate, *S.R. Nehad*, 929 F.3d at 1140–41, one notable difference between *Cruz* and the present case is that the decedent in Cruz had stopped his vehicle

United States District Court
Northern District of California

finds that Tovar did not reach for his waistband or make some other threatening gesture, even in the context of Tovar's criminal history and attempts to evade arrest, deadly force would not be reasonable under *Cruz*. In other words, in the event that a reasonable jury finds Jorgensen, Soh, and collectively fired their rifles fifteen times on a suspect who did not give any indication that he possessed a weapon or intended to use a weapon against the officers, which the Court found above is possible, then Jorgensen, Soh, and Lopez would have violated clearly established law prohibiting deadly force on a suspect who does not pose a threat to safety. *See, e.g., Cruz*, 765 F.3d at 1078.

Second, it is clearly established law in the Ninth Circuit "that continued force against a suspect who has been brought to the ground can violate the Fourth Amendment. *Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). If a jury finds that an officer used force after the suspect no longer posed an immediate threat, the officer would have been "on notice that his conduct would be clearly unlawful." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)); *see also Hopkins v. Andaya*, 958 F.2d 881, 887 (9th Cir. 1992) (holding as unreasonable an officer's decision to shoot a suspect who had already been shot when alternative courses of action were open to the officer) (overruled on other grounds).

Here, if a jury finds that Soh and Lopez used deadly force on a suspect who they should have known had already been shot and fallen to the ground, which the Court previously found possible given the video and other circumstantial evidence, then Soh and Lopez would have violated clearly established law prohibiting deadly force on a suspect who has been brought to the

---

and opened his door before the police opened fire, whereas Tovar was actively running when Jorgensen first opened fire. However, the Ninth Circuit has also clearly held that, where there is no immediate threat to safety, "the shooting of an unarmed, non-dangerous suspect to prevent the suspect's flight is a violation of the Fourth Amendment." *Adams v. Speers*, 473 F.3d 989, 994 (9th Cir. 2007). While Tovar had a history of serious crimes, it is for a jury to resolve disputed facts and decide what impact Tovar's criminal history had on the reasonableness of Jorgensen, Soh, and Lopez's use of force here. For example, while "burglary is a serious crime," the Supreme Court has held that "it is so dangerous as automatically to justify the use of deadly force." *Tennessee*, 471 U.S. at 21. Further, while Tovar was considered a suspect in homicides, Defendants have not suggested that Officer Defendants had the required "probable cause" to believe that Tovar committed these crimes. *Id.* at 11.

Case No.: 5:21-cv-02497-EJD
ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
27

1  ground and no longer poses an immediate threat.

2      Third, it has long been established law that allowing police dogs to bite unresisting

3  suspects who do not pose a threat to safety is unconstitutional.  *Zion*, 874 F.3d at 1076 (citing

4  *Drummond ex Rel. Drummond v. City of Anaheim*, 343 F.3d 1052 at 1057–58 (9th Cir. 2003); *See*

5  *Dawson v. County of Stanislaus*, 2023 WL 2059081 at *15 (CA ED Feb. 16, 2023) ("The contours

6  of the right as related to the use of a police dog have been clearly established in the Ninth Circuit

7  since at least 1994."); *Sweiha*, 2021 WL 292517 at *5 ("For more than 20 years, it has been

8  clearly established that excessive duration of [a dog] bite or improper encouragement of a

9  continuation of an attack by officers could constitute excessive force that would be a constitutional

10  violation.").  Further, it has been long established that an unnecessarily excessive duration of

11  canine bites can be unconstitutional.  *Watkins v. City of Oakland*, 145 F.3d 1087 (9th Cir. 1998)

12  (denying qualified immunity when officer allowed a dog to bite a suspect for ten to fifteen seconds

13  while surrounded by other officers with guns); *Burns v. City of Concord*, 2017 WL 5751407, at

14  *13 (N.D. Cal. Nov. 28, 2017) (finding that deploying a police canine on an incapacitated, dying

15  individual who posed no threat to officers for ten to fifteen seconds violated clearly established

16  law).

17      Regarding Fonua, the Court has already found that Fonua's conduct in allowing the K-9 to

18  attack Tovar for two minutes and forty seconds when Tovar did not pose any threat violated the

19  Fourth Amendment.  The Court finds that this constitutional violation was clearly established at

20  the time of Fonua's conduct, as case law clearly states that officers may not release a K-9 and

21  allow it to excessively attack a suspect when the suspect has been injured and poses no threat to

22  the officers.  *See, e.g., Watkins*, 145 F.3d 1087; *Burns*, 2017 WL 5751407, at *13.

23      Regarding Jimenez, if a reasonable jury similarly finds that Jimenez authorized a K-9

24  deployment for two minutes and forty seconds under these circumstances, as the Court previously

25  found possible, then Jimenez would have also violated clearly established law regarding

26  permissible use of K-9s.  Indeed, courts have found clear Fourth Amendment violations when K-

27  9s have attacked less injured suspects for far less time.  *See, e.g., id.*

28  Case No.: 5:21-cv-02497-EJD
ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION

United States District Court
Northern District of California

1

2        **2.     Fourteenth Amendment**

3        The Court also finds that qualified immunity does not shield Soh, Lopez, Fonua, or

4   Jimenez from liability for Plaintiffs' Fourteenth Amendment claims under these circumstances, as

5   Plaintiffs have presented facts by which a reasonable jury could find a violation of a clearly

6   established constitutional right.[6]

7                          **a.      Violation of Constitutional Right**

8        "Parents and children may assert Fourteenth Amendment substantive due process claims if

9   they are deprived of their liberty interest in the companionship and society of their child or parent

10  through official conduct." *Lemire v. California Dept. of Corrections and Rehabilitation*, 726 F.3d

11  1062, 1075 (9th Cir. 1986).  Excessive force claims typically must be "analyzed under the Fourth

12  Amendment's 'objective reasonableness' standard, rather than under a substantive due process

13  standard." *Graham*, 490 U.S. at 388.  But a familial relations claim alleges a different

14  constitutional violation under the Due Process Clause that is not barred by *Graham*.  *Curnow*, 952

15  F.2d at 325.  Conduct that "shocks the conscience" violates due process.  *Wilkinson*, 610 F.3d at

16  554.  The Fourteenth Amendment's due process "shocks the conscience" standard is met either by

17  a showing that officers acted with "deliberate indifference" or a "purpose to harm" unrelated to the

18  legitimate object of arrest, depending on the circumstances.  *Porter v. Osborne*, 546 F.3d 1131,

19  1137 (9th Cir. 2008).  Plaintiffs concede that the purpose to harm standard applies to the present

20  circumstance given the lack of time to deliberate.  *See* Pls.' Reply 10.

21       The Court finds that, when viewing all facts in the light most favorable to Plaintiffs, a

22  reasonable jury could conclude that Soh, Lopez, Fonua, and Jimenez acted with the purpose to

23  harm unrelated to a legitimate law enforcement objective.  For example, if a reasonable jury finds

24  that Soh and Lopez knew or should have known that Tovar had already been shot by the time they

25  fired their rifles, then that jury could also reasonably question what purpose Soh and Lopez had

26  *other than* the purpose to harm.  Similarly, if a reasonable jury finds that the officers knew or

27  _____

28  [6] Plaintiffs have stipulated to the dismissal of their Fourteenth Amendment claim against
    Jorgensen.  Pls.' Reply 15 n.2.

1   should have known that Tovar was incapable of complying with commands because he had been

2   severely wounded, then that jury could also find that there was no legitimate law enforcement

3   objective to use the K-9.  This also leaves the door open for the jury to examine other

4   circumstantial evidence in the record and conclude that Defendants acted with an ulterior purpose

5   to harm.

6       Therefore, when viewed in the light most favorable to Plaintiffs, the Court finds that a

7   reasonable jury could conclude that Soh, Lopez, Fonua, and Jimenez acted with the purpose to

8   harm in violation of the Fourteenth Amendment.

9                    **b.    Clearly Established Right**

10      Qualified immunity is designed to protect "all but the plainly incompetent or those who

11  knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).  In *A.D. v. California*

12  *Highway Patrol*, 712 F.3d 446, 455 (9th Cir. 2013), the Ninth Circuit found that any reasonable

13  officer would know that "acting with a purpose to harm unrelated to a legitimate law enforcement

14  objective (such as arrest, self-defense, or the defense of others) violates due process."  In other

15  words, "it has been clearly established since 1998 that a police officer violates the Fourteenth

16  Amendment due process clause if he kills a suspect when acting with the purpose to harm,

17  unrelated to a legitimate law enforcement objective."  *Foster v. City of Indio*, 908 F.3d 1204, 1211

18  (9th Cir. 2018) (internal quotation marks omitted).

19      In the event that a reasonable jury finds Soh, Lopez, Fonua, and Jimenez shot Tovar after

20  he had fallen to the ground and allowed a K-9 to attack Tovar for two minutes and forty seconds

21  with the purpose to harm Tovar in the absence of any legitimate law enforcement objective, then

22  the Court finds that Soh, Lopez, Fonua, and Jimenez would have violated clearly established law

23  prohibiting them from acting with the purpose to harm.

24                              * * *

25      Therefore, the Court finds that Officer Defendants are not entitled to qualified immunity at

26  this stage and **DENIES** Defendants' motion for summary judgment as to Plaintiffs' Fourth and

27  Fourteenth Amendment claims.

28  Case No.: 5:21-cv-02497-EJD
    ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION

United States District Court
Northern District of California

### B.        Violation of State Law

Finally, Defendants move for summary judgment on Plaintiffs' state law claims, specifically, Plaintiffs' claims under the Bane Act and claims for negligence.

#### 1.        Bane Act

The Bane Act authorizes individual civil actions for damages and injunctive relief by individuals whose federal or state rights have been interfered with by threats, intimidation, or coercion.  *See* Cal. Civ. Code § 52.1(a) (proscribing interference "by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state"); *see also Jones v. Kmart Corp.*, 17 Cal. 4th 329, 338 (1998) (interpreting Bane Act's use of "interferes" to mean "violates").  "[T]he Bane Act does not require the 'threat, intimidation or coercion' element of the claim to be transactionally independent from the constitutional violation alleged." *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 798 (2017), as modified (Nov. 17, 2017).  Instead, the Bane Act requires that a defendant had a specific intent to violate the plaintiff's protected rights.  This specific intent inquiry centers on two questions: "First, 'is the right at issue clearly delineated and plainly applicable under the circumstances of the case,' and second, 'did the defendant commit the act in question with the particular purpose of depriving the citizen victim of his enjoyment of the interests protected by that right?'" *Sandoval v. Cty. of Sonoma*, 912 F.3d 509, 520 (9th Cir. 2018) (quoting *Cornell*, 17 Cal. App. 5th at 803 (alterations omitted)). Specific intent does not require a showing that a defendant knew he was acting unlawfully; "[r]eckless disregard of the 'right at issue' is all that [is] necessary." *Cornell*, 17 Cal. App. 5th at 804.

Regarding specific intent, if a plaintiff adequately pleads a claim for deliberate indifference, which requires a pleading of reckless disregard, then he has sufficiently alleged the intent required for the Bane Act claim. *Scalia v. Cty. of Kern*, 308 F. Supp. 3d 1064, 1084 (E.D. Cal. 2018) (finding coercive act element of Bane Act claim satisfied by allegation of prison

official's deliberate indifference to serious medical needs); *see also M.H. v. Cty. of Alameda*, 90 F. Supp. 3d 889, 898 (N.D. Cal. 2013) (holding that because deliberate indifference "has been associated with affirmatively culpable conduct," a prison official's failure to act with deliberate indifference to an inmate's medical needs could adequately state a claim for relief under the Bane Act).

The Court found above that a reasonable jury could conclude that all Officer Defendants used excessive force in violation of the Fourth Amendment and acted with the purpose to harm in violation of the Fourteenth Amendment when they unnecessarily shot and released a K-9 on Tovar.  For all the reasons discussed above, the Court finds that, when viewed in the light most favorable to Plaintiffs, a reasonable jury could find that this same conduct—firing rifles fifteen times and allowing a K-9 to attack Tovar for two minutes and forty seconds—constitutes reckless disregard of the Fourth and Fourteenth Amendments.

Therefore, the Court finds disputed material facts preclude Defendants' request for summary judgment on this claim.

### 2.   Negligence Claims

For all the reasons discussed above, the Court finds that disputed facts regarding the reasonableness of Soh and Lopez's use of force preclude summary judgment for Defendants as to Plaintiffs' negligence claim. The Court also already granted summary judgment as to Plaintiffs' negligence claim against Fonua based on its examination of the facts in the light most favorable to Fonua.

As to Officer Defendants not discussed in Plaintiffs' MSJ, Jorgensen and Jimenez, the Court's inquiry again overlaps with the Fourth Amendment analysis above in that it turns on the reasonableness of Officer Defendants' use of force.  *See, e.g., Hernandez*, 46 Cal. 4th at 514. Because the Court found that a reasonable jury could conclude that Jorgensen and Jimenez used excessive force in violation of the Fourth Amendment, the Court denies Defendants' motion for

United States District Court
Northern District of California

1   summary judgment on Plaintiffs' negligence claims against Jorgensen and Jiminez as well. [7]

2                                    * * *

3        The Court therefore **DENIES** Defendants' Cross-MSJ in its entirety.

4   **V.      PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE EXPERT OPINION**

5        Plaintiffs move to exclude two expert opinions of James Borden ("Borden"), who

6   Defendants retained to provide his expert knowledge of "police use-of-force decision-making and

7   action [verse] reaction timing."  Expert Report on Use-of-Force and Video Evidence Review

8   ("Borden Report"), ECF No. 84-1.  The Court will begin with a summary of Borden's expert

9   report before moving to Plaintiffs' arguments.

10       **A.      Background**

11       Borden was a law enforcement officer for the Henderson Police Department in Las Vegas,

12  Nevada for approximately eighteen years and retired a sergeant of the training bureau.  Dep. of

13  James Borden ("Borden Dep.") 6–7, 9.  Borden received a "Basic Force" certificate from a one-

14  week course at the Force Science Institute and an "Advanced Specialist in Force Analysis"

15  certificate from a thirteen-week course.  *Id.* at 14–16.  Borden's educational attainment is a high

16  school diploma.  *Id.* at 13–14.  Borden does not have a degree in neurology, neuropsychology,

17  psychiatry, psychology, or biomechanics.  *Id.*  Borden has not conducted any studies or published

18  any peer-reviewed article on reaction times, cognition or officer psychology.  *Id.* at 20–24.

19       Borden undertook his review of this case "as a *professional practices expert*, where

20  specific scientific principles related to police practices are part of the review and analysis."

21  Borden Report 3–4 (emphasis in original).  Borden also stated that he "conducted a *scientific*

22  *analysis* and examination of video evidence where [he was] applying repeatable processes and

23  producing an accurate evaluation of the digital evidence."  *Id.* (emphasis in original).

24

25  ───────────────
    [7] While Defendants indicated that they also seek summary judgment on Plaintiffs' state law claim
    for battery, Defendants failed to make any arguments specific to Plaintiffs' battery claim.  *See*

26  Cross-MSJ 1, 24–25.  Regardless, given that "[b]attery is a state law tort counterpart to [an]
    excessive force claim," the Court denies Defendants' request for summary judgment on Plaintiffs'

27  batter claim for all the reasons discussed in its analysis of Officer Defendants' use of force.  *J.P. v.
    City of Porterville*, 801 F. Supp. 2d 965, 990 (E.D. Cal. 2011).

28

United States District Court
Northern District of California

Borden offers a variety of opinions, of which Plaintiffs specifically challenge two: (1) Opinion 3: "[t]he articulated need to use deadly force by Officer Jorgensen, Officer Soh, and Officer Lopez, based upon Tovar's behavior, was consistent with the observable behavior in the BWC evidence," *id.* at 19; and (2) Opinion 4: "the observations articulated regarding the deadly threat presented by Tovar were accurate," *id.* at 39.

In forming Opinions 3 and 4, Borden relied on a "stop and start" experiment conducted by William Lewinski, which found that an officer's "perception, reaction, and response time is approximately 560 [milliseconds]." *Id.* at 35. Using Lewinski's study, Borden analyzed what Soh and Lopez saw 560 milliseconds before the officers pulled their triggers based on the video and audio evidence and concluded that they did not see Tovar on the ground when they pulled the trigger, regardless of the video's depiction of Tovar lying on the ground before they fired. *Id.*

Borden made other opinions to explain the discrepancy between what the officers claimed they saw and what the video evidence depicts. *Id.* at 34–35. For example, Borden compared the time he says it took Lopez to raise his gun and spot Tovar through his rifle to the time it takes to blink an eye, which, according to the Library of Medicine home page, is 300 milliseconds. *Id.* at 26, 35. Borden also explained the misalignment between the video evidence and officer statements by opining, without citations, that the officers' use of the optical for their rifles reduced the visual area available to them. *Id.* at 37. Finally, Borden further opined, without citations, that "an officer is interpreting visual data for the purpose of decision making, not storing it for recall," and "[m]is-alignment in these types of scenarios is a 'mistake of fact' based upon perceptional issues, timing, actions and chronology," concluding that "[t]here is a vehement difference between a belief of facts that occurred differently than recalled, and a dishonest account of the incident." *Id.* at 38.

## B. Discussion

As the Court discussed in greater detail in its legal standard section, an expert must be qualified to give her opinions by her "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Once she is qualified, Rule 702 permits her to testify as long as "(a) the expert's

1    scientific, technical, or other specialized knowledge will help the trier of fact to understand the

2    evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

3    the testimony is the product of reliable principles and methods; and (d) the expert's opinion

4    reflects a reliable applicable of the principles and methods to the facts of the case." *Id.*

5         Plaintiffs argue that these opinions should be excluded because (1) Borden does not have

6    the necessary educational background to form these opinions, and (2) Borden's opinions are based

7    on unreliable science.  The Court will address each argument in turn.

8                        **1.    Education and Experience**

9         The Court finds that Borden does not have the educational background or experience

10   necessary to "apply scientific principles related to police practices" or "conduct *scientific analysis*

11   and examination of video evidence."  Borden Report 3–4 (emphasis in original).  Borden simply

12   has no scientific or technical background which would make him qualified to testify to topics

13   implicating psychology, neurology, neuropsychology, psychiatry, psychology, or biomechanics.

14        Defendants do not attempt to defend Borden's use of any scientific principles or scientific

15   analyses.  In fact, Defendants appear to concede that Borden is not qualified to proffer any opinion

16   regarding his force science demonstrations.  *See, e.g., Daubert* Opp'n 5, 7.  Instead, Defendants

17   characterize Borden's expert report as opining only about police officer training, which they argue

18   he is experienced to provide based on his background in law enforcement and training.  *Id.*

19   However, Plaintiffs do not dispute that Borden is qualified to testify regarding training practices,

20   and they do not object to the first two opinions that do in fact rely on Borden's expertise in law

21   enforcement training.  *See Daubert* Reply 3 ("Mr. Borden may have plenty of experience in law

22   enforcement and law enforcement training, but he has no relevant training, education or discipline

23   in what a person can see and how long it takes them to react to stimuli.").  The question instead is,

24   does Borden have the education and experience necessary to inform a jury about, for example,

25   how many milliseconds it takes an officer to perceive an event and how the misalignment between

26   an officer's memory of a scenario and what is depicted on a video is a "mistake of fact based upon

27   perceptional issues, timing, actions and chronology"?  The Court finds that he does not.

28   Case No.: 5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
                                    35

United States District Court
Northern District of California

1    Therefore, the Court finds that Borden lacks the requisite education and training to testify

2    as to the scientific principles in his report.

3              **2.    Methodologies**

4    The Court also finds that the methodologies Borden implements and studies upon which he

5    based his opinions are unreliable.

6    When questioned on the Lewinski study underlying his "stop and start" theory, Borden

7    believed that the experiment was only conducted once with maybe more than fifty officers in the

8    experiment, but Borden did not know where the officers came from or where the study was

9    conducted.  Borden Dep. 31–32.  Borden also believed that any officer could have participated in

10   the study regardless of experience, and therefore the study did not examine if there were any

11   measurable differences between the reaction times of less experienced verse more experienced

12   officers or consider any other factors specific to the participants.  *Id.*

13   Defendants do not respond to Plaintiffs' criticisms of Lewinski's study, or Borden's

14   application of it, instead arguing that it is "beside the point" because "[t]he issue is not [] the

15   actual time it took any officer in this case to perceive, react, and respond to Tovar's actions . . . .

16   [it] is that officers are trained to take reaction time into account in responding to dangerous

17   situations."  *Daubert* Opp'n 5.  However, Borden explicitly provides opinions regarding the actual

18   time it takes officers to perceive, react, and respond to danger, and applies that time to his opinions

19   regarding Defendant Officers' conduct.  This opinion exceeds how much time officers are trained

20   to wait before reacting.

21   Therefore, the Court also finds that the studies upon which Borden bases his scientific

22   opinions are impermissibly unreliable.

23                       * * *

24   Therefore, the Court **GRANTS** Plaintiffs' motion to exclude Borden's opinions that are

25   based on scientific principles or analyses.  Specifically, Borden may not opine as to how much

26   time passes between an officer's perception of an event and the decision to shoot or offer any

27   opinion that applies scientific principles related to police practices or any scientific analysis of

28   Case No.: 5:21-cv-02497-EJD

1    video evidence.  Borden may still offer opinions based on his expertise in law enforcement

2    training.  The parties may raise further objections during Borden's testimony at trial as necessary.

3    **VI.    CONCLUSION**

4         Based on the foregoing, the Court **GRANTS** Plaintiffs' motion for summary judgment as

5    to the Fourth Amendment and negligence claims against Fonua.  The Court **DENIES** Plaintiffs'

6    motion as to all other claims.  The Court **DENIES** Defendants' motion for summary judgment in

7    its entirety.  The Court **GRANTS** Plaintiffs' *Daubert* motion.

8         **IT IS SO ORDERED.**

9    Dated: September 24, 2024

10

11

12                                                   EDWARD J. DAVILA
                                                     United States District Judge
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   Case No.: 5:21-cv-02497-EJD
     ORDER REGARDING MSJ, CROSS-MSJ, AND DAUBERT MOTION
                                37

United States District Court
Northern District of California